# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| MURSAL ZALMAI, | ) |
| *Plaintiff*, | ) ) ) |
| v. | ) Civil Action No. 1:24-cv-497 (PTG/WBP) |
| CORLISS ALVINA JOSEPHS-CONWAY, | ) Patricia Tolliver Giles ) ) |
| *Defendant*. | ) ) ) |

## MEMORANDUM OPINION

This matter is before the Court on the parties' cross-motions for summary judgment. Dkts. 18, 23. Plaintiff Mursal Zalmai has filed this civil action against the Director of the Washington Field Office of the U.S. Citizenship and Immigration Services ("USCIS") seeking review of USCIS's denial of her Form N-400, Application for Naturalization (Dkt. 1). The cross-motions for summary judgment have been fully briefed and the Court has heard oral argument on the matter. Dkts. 19, 24, 26, 27, 31, 32. For the reasons that follow, Plaintiff's Motion for Summary Judgment (Dkt. 18) is **GRANTED** and Defendant's Motion for Summary Judgment (Dkt. 23) is **DENIED**.

### Factual and Procedural Background

The essential material facts are not in dispute. Mursal Zalmai ("Plaintiff") is a citizen of Afghanistan who entered the United States in December 1994 with her then-husband, Abdul Saker Zalmai, and their daughter. Dkts. 11-1, 11-2, Administrative Record ("A.R."), at 38, 81, 88. Later that month, Plaintiff's then-husband submitted an asylum application including Ms. Zalmai as his spouse. A.R. 86. Plaintiff did not independently apply for asylum. *See* A.R. 32. On May 3, 1995,

the Immigration and Naturalization Service ("INS") "charged [Plaintiff] as removable under former [Immigration and Nationality Act ("INA")] § 241(a)(1)(B) . . . because she entered the United States without inspection." Dkt. 24 ¶ 5, at 6 (citing A.R. 81, 83 and noting the current provision is 8 U.S.C. § 1182(a)(6)(A)(i)). On June 28, 1995, an Immigration Judge ("IJ") granted Plaintiff's then-husband asylum. A.R. 80. Thus, Ms. Zalmai was also granted asylum as a derivative asylee. A.R. 32, 80. On January 4, 2000, Plaintiff applied to adjust her status to lawful permanent residence by completing Form I-485, Application to Register Permanent Residence or Adjust Status.[1] A.R. 76-79. On November 27, 2002, Plaintiff divorced her husband. A.R. 74-75. On January 31, 2005, USCIS approved Plaintiff's application for adjustment of status, granting her permanent lawful residence, without interviewing Plaintiff. A.R. 32, 62, 76; Dkt. 24 ¶ 10, at 7.

In October 2011, Ms. Zalmai applied for naturalization and included evidence of her divorce. A.R. 73-75. On April 9, 2012, Ms. Zalmai was interviewed in connection with her naturalization application. A.R. 62. On April 11, 2012, USCIS denied her application because they determined that Ms. Zalmai was "ineligible for naturalization because [she was] not lawfully admitted for permanent residence." *Id.* USCIS found that "because Ms. Zalmai divorced from her husband before the agency approved her I-485 application, she was not eligible for permanent residence based on her asylee status, and therefore, was not lawfully admitted for permanent residence." Dkt. 19 ¶ 15, at 3 (citing A.R. 31-34).

---

[1] USCIS's Decision on Application for Naturalization, dated April 11, 2012, states that Plaintiff filed her Form I-485 on February 4, 2000. A.R. 62. Defendant also notes that Plaintiff signed her application on January 21, 2000. *See* Dkt. 24 ¶ 8, at 6. It appears Plaintiff signed her application on January 4, 2000. A.R. 79. Plaintiff's counsel signed the application on January 21, 2000. *Id.*

2

On April 20, 2012, Plaintiff filed a Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings, to appeal the denial of her application. A.R. 60. In January 2013, Plaintiff ultimately withdrew her October 2011 application, which USCIS acknowledged. AR. 58-59.[2] On September 29, 2021, Plaintiff submitted another naturalization application by filing Form N-400, Application for Naturalization. A.R. 37-56. On December 7, 2022, USCIS denied that application. A.R. 31-34. On March 6, 2023, Ms. Zalmai appealed the denial of her September 2021 application and requested another hearing on USCIS's naturalization decision. A.R. 19. On June 13, 2023, Plaintiff attended the hearing to review the denial. A.R. 14. On August 1, 2023, USCIS issued a Notice of Intent to Deny. A.R. 13. On September 1, 2023, Plaintiff responded to USCIS's Notice of Intent to Deny. A.R. 9. On February 20, 2024, USCIS affirmed the denial. A.R. 1. On March 28, 2024, Plaintiff filed the instant civil action. *See* Dkt. 1.

**Legal Standard**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The INA permits applicants for naturalization to seek review of their application's "denial before the United States district court for the district in which such person resides in accordance with [5 U.S.C. §§ 701-706]." 8 U.S.C. § 1421(c). "Courts review a decision denying a naturalization application *de novo*." *Dung Phan v. Holder*, 667 F.3d 448, 451 (4th Cir. 2012). "[T]he burden is on the…applicant to show…eligibility for citizenship in every respect." *Bereyni v. District Director, I.N.S.*, 385 U.S. 630, 637 (1967). "[D]oubts regarding eligibility for citizenship are resolved in favor of the government and against the applicant." *Id.* A "district court has no equitable authority

---

[2] USCIS's acknowledgement of withdrawal states that Plaintiff filed a request for a hearing on or about May 18, 2012. A.R. 58. However, Plaintiff's application was signed on April 20, 2012. A.R. 60.

3

to naturalize applicants who are ineligible under the law." *Dorbor v. United States*, 379 F. Supp. 3d. 765, 767 (W.D. Wis. 2019) (citing *INS v. Pangilinan*, 486 U.S. 875, 885 (1988)).[3]

The INA contains three requirements for naturalization, the applicant:

"(1) . . . has resided continuously, after being lawfully admitted for permanent residence within the United States for at least five years[,] (2) has resided continuously within the United States from the date of application up to the time of admission to citizenship, and (3) during all periods referred to has been and still is a person of good moral character. . . ."

*Soumah v. Collett*, 738 F. Supp. 3d 631, 634 (D. Md. 2024) ("*Soumah I*") (quoting 8 U.S.C. § 1427(a)). "[N]o person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of [the INA]." *Id.* at 634-35 (quoting 8 U.S.C. § 1429).

## Analysis

The central question in dispute is whether under 8 U.S.C. § 1159(b)(3), an applicant for lawful permanent residence who derives their asylee status from being a spouse of a refugee must "continue[]" to be a spouse of a refugee: (1) until their application for adjustment has been adjudicated; or (2) only at the time they file their application for adjustment. USCIS denied Plaintiff's naturalization application several times because it concluded that she had not met one of the statutory requirements for naturalization, being admitted for lawful permanent residence. A.R. 13-16, 31-34, 62. Although USCIS granted Plaintiff lawful permanent residence status in January 2005, because Plaintiff divorced her husband prior to the adjudication of her adjustment application, USCIS asserts that she was not eligible for lawful permanent residence. Consequently, USCIS asserts that Plaintiff was ineligible to be naturalized. Because this dispute turns on a

---

[3] The Homeland Security Act transferred authority to naturalize applicants to USCIS, which is housed within the Department of Homeland Security. *Mestanek v. Jaddou*, 93 F. 4th 164, 170-71 (4th Cir. 2024).

4

question of statutory interpretation, this Court will proceed to construe the statute. For the reasons that follow, this Court finds that an applicant for adjustment of status must only continue to be a spouse of a refugee at the time they file their application for adjustment, at least one year after they have been granted asylum.

The Court begins, as it must, with the text of the statute, giving the words their ordinary plain meaning in view of the text's context and statute's structure. *Dwoskin v. Bank of Am., N.A.*, 888 F.3d 117, 119 (4th Cir. 2018). If the statute is clear and unambiguous, the matter is at its end. *See Pereira v. Sessions*, 585 U.S. 198, 208 (2018) (citing *Chevron U.S.A. Inc., v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Even if the text is ambiguous, then the Court must still "use every tool at [its] disposal to determine the best reading of the statute and resolve the ambiguity." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024).

  *I.*  *The Statute is Ambiguous*

In relevant part, § 1159(b) provides:

The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who--

  (1) applies for such adjustment,

  (2) has been physically present in the United States for at least one year after being granted asylum,

  (3) *continues to be a refugee* within the meaning of section 1101(a)(42)(A) of this title *or a spouse or child of such a refugee,*

  (4) is not firmly resettled in any foreign country, and

  (5) *is admissible* (except as otherwise provided under subsection (c)) *as an immigrant* under this chapter *at the time of examination for adjustment of such alien.*

8 U.S.C. § 1159(b) (emphasis added).

5

The statute, specifically subsection (b)(3), says "continues to be a refugee . . . or a spouse or child of such refugee." Neither party disputes that the plain meaning of the word "continues" is "ongoing" or that the word refers to some present condition.[4] Defendant argues that Plaintiff does not offer an alternate construction of the word "continues" and so this Court should find that Plaintiff has conceded to Defendant's construction. *See* Dkt. 31 at 5. That, however, fails to fully capture the crux of the parties' dispute. Neither side disagrees about the meaning of the word "continues" itself. Both agree that an applicant must, at some point, continue to be a spouse of the asylee. Instead, the dispute turns on how long the applicant must continue to be a spouse or child of such a refugee: (1) at the time of filing the adjustment application or (2) through adjudication of the application. A natural and plain reading of the text of subsection (b)(3) does not expressly foreclose either possibility. Thus, the meaning of the text alone is ambiguous.

Even looking to the surrounding provisions of the statute, the meaning of subsection (b)(3) remains unclear. Subsection (b)(2) requires an applicant to have "been physically present in the United States for at least one year after being granted asylum." 8 U.S.C. § 1159(b)(2). Subsection (b)(4) speaks to a present condition that would necessarily undermine an applicant's asylum status—if they would have "firmly resettled" in another country. 8 U.S.C. § 1159(b)(4). The parties dispute the meaning of the phrase "examination for adjustment" in subsection (b)(5). At any rate, it is clear that this provision contains some direction that an immigrant must be admissible at some point in the process.

*Soumah v. Collett* and *Dorbor v. United States* are the only cases which address the proper interpretation of 8 U.S.C. § 1159(b)(3). *See Soumah*, 738 F. Supp. 3d 631 (D. Md. 2024) ("*Soumah*

---

[4] *Continue*, *Merriam-Webster Online Dictionary* https://www.merriam-webster.com/dictionary/continues (last visited Mar. 25, 2025) (defining "continues" as "to maintain without interruption a condition, course, or action;" "to remain in existence;" "to remain in a place or condition").

*I*"); *Dorbor*, 379 F. Supp. 3d. 765 (W.D. Wis. 2019). Importantly, both cases were decided prior to the Supreme Court's ruling in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), which overruled *Chevron* deference.[5] *Dorbor* did not reach *Chevron* because the court felt that the defendants did not offer agency interpretations to which the court might, under *Chevron*, have to defer. 379 F. Supp. 3d at 768. *Soumah I* also did not apply *Chevron* because the court found that Plaintiff's interpretation of the statute would not conflict with the USCIS's proffered regulation and that the offered Board of Immigration Appeals' ("BIA") decisions were unreasonable, arbitrary, and capricious to the extent they interpreted 8 U.S.C. § 1159(b)(3).[6] 738 F. Supp. 3d at 642-44. Because the plain text of the statute is ambiguous, under *Loper Bright*, this Court will "use every tool at [its] disposal to determine the best reading of the statute and resolve the ambiguity." 603 U.S. at 400.

## II. The Best Reading of the Statute

Under *Chevron,* this Court would next normally determine whether the agency's interpretation of the statute is reasonable or permissible. *Song v. Garland*, 54 F.4th 233, 237-38 (4th Cir. 2022) (applying *Chevron* to interpret 8 U.S.C. § 1255). However, USCIS's regulation directly interpreting this specific statute merely restates the statute, with slight deviations in the language. *See* 8 C.F.R. § 209.2(a)(iiii); *see also Dorbor*, 379 F. Supp. 3d at 768 n.2 (acknowledging that the regulation exists and adds the word "is" before "the spouse or child").

---

[5] *Soumah I* was decided on a Motion to Dismiss. 738 F. Supp. 3d 631. Since this Court heard oral argument on the instant motion, the *Soumah* court ruled on the motion for summary judgment. *Soumah v. Collett,* 2025 WL 638472 (D. Md. Feb. 27, 2025) ("*Soumah II*").

[6] Here, Defendant offers the same agency regulation and argues that a Fourth Circuit interpretation of similar statutory language compels this Court's resolution of the interpretive question. Dkt. 24 at 27-29; *see generally Injeti v. USCIS,* 737 F.3d 311 (4th Cir. 2013). This argument is addressed, *infra* at 17-19.

Notably, Defendant does not argue that this Court should afford 8 C.F.R. § 209.2(a)(iiii) any interpretive weight. The Court will first determine the best reading of the statutory text, independent of the agency regulation.

As stated, *Soumah* and *Dorbor* appear to be the only courts to have specifically determined whether 8 U.S.C. § 1159(b)(3) requires that an adjustment applicant remain married to their spouse until their application is adjudicated or only at the time they file their application for adjustment. Neither court's holding is binding on this Court. Both decisions are on point as they concern an applicant who: (1) is a derivative asylee of a spouse; (2) applied for adjustment of status; (3) divorced before their application was adjudicated; and (4) was granted lawful permanent resident status.[7] Defendant argues that this Court should not be persuaded by these cases because both courts read 8 U.S.C. § 1159(b) differently from each other and their readings cannot be reconciled with the text. *See* Dkt. 31 at 9-14.

This Court disagrees with Defendant.[8] Both courts arrived at the same conclusion: the statute does not require an asylee to remain the spouse of the principal asylee until USCIS adjudicates the application. At any rate, *Soumah I* states that the court "agrees with and adopts the reasoning of *Dorbor* in relation to the significance of the language in § 1159(b)(1) and (b)(2)." 738 F. Supp. 3d at 639; Dkt. 27 at 5. Thus, the *Soumah* and *Dorbor* courts did not apply different reasoning to arrive at their conclusions.

---

[7] *Soumah II* is particularly persuasive because the court ruled on summary judgment. 2025 WL 638472.

[8] The Court observes that even if Defendant's assessment was correct, the fact that two courts addressing the question interpreted the text differently speaks to the text's ambiguity, not its clarity.

8

The *Dorbor* court noted that § 1159(b)(1) refers to an applicant who "applies for [an] adjustment" as opposed to one who "applied" for an adjustment at some time in the past. 379 F. Supp. 3d at 770 (alteration in original) (emphasis omitted). Then, the court also noted that § 1159(b)(2) requires that an applicant be "physically present in the United States for at least one year after being granted asylum." *Id.* The court reasoned that the only reasonable reading of the statute was that one could not apply for adjustment until he or she had been in the country for a year; thus, if the time of the decision mattered then subsection (b)(2) would have no meaning. *Id.* Therefore, the court concluded "continues" in § 1159(b)(3) "refers to the time between the grant of asylum and the filing of the application." *Id.* at 769. In *Soumah I*, the court agreed with this analysis and then noted that it was merely more persuaded that because § 1159(b)(5) *expressly* requires that an immigrant be admissible through "examination for adjustment," § 1159(b)(3) did not require that applicants remain spouses through adjudication of their application. *See* 738 F. Supp. 3d at 639. Each court, after looking at § 1159(b) as a whole, concluded that an applicant need not "continue" to be a spouse through adjudication of their application. In reading the two decisions, this Court does not find any inconsistency in the reasoning in *Dorbor* and *Soumah I*. Indeed, this Court finds them both persuasive.

In Defendant's view, *Soumah I's* reasoning is erroneous because it assumed that examination for adjustment is synonymous with adjudication. Dkt. 24 at 23-25. Defendant argues that "adjudication" and "examination for adjustment" are distinct because, through other provisions of the INA, USCIS would typically conduct a naturalization interview and initial review of an applicant's eligibility. *See* Dkt. 26 at 24-25. Thus, Defendant contends that "examination for adjustment" means the naturalization interview, or in this case, adjustment interview, not the agency's adjudication. *Id.* Even if this reading is correct, it does not foreclose or determine

9

whether the conditions of subsection (b)(3) must be met at the time of filing the application or at adjudication, or both.

In addition, Defendant asserts that subsection (b)(5)'s requirement that an applicant be admissible through "examination for adjustment" serves to facilitate the Secretary or Attorney General's waiver process referenced in § 1159(c). *See* Dkt. 24 at 25. Even so, it is unclear why "examination for adjustment" is a "process" separate from adjudication rather than merely statutorily granting the Secretary the authority to waive the admissibility requirement.[9] Moreover, Defendant provides no legal authority to support its argument. *Accord Soumah v. Collett*, 2025 WL 638472, at *5 (D. Md. Feb. 27, 2025) ("*Soumah II*") (noting that "USCIS provide[d] no legal authority . . . in support of its assertion that 'examination for adjustment' is a separate and distinct event").

Even assuming, *arguendo*, that subsection (b)(5)'s "examination for adjustment" requirement applies to subsection (b)(3), and USCIS interviewed Plaintiff in connection with her application for adjustment, Defendant's reading still would not support Defendant's broader argument that an applicant must remain married to their "spouse" at the time of adjudication. Had USCIS conducted an interview of Plaintiff, she may well have been married to her spouse at the time. Additionally, Defendant notes that USCIS did not know that Plaintiff had divorced her husband. *See* Dkt. 26 ¶ 10, at 7. In *Dorbor*, however, the plaintiff listed his marital status as divorced in his application, was interviewed by USCIS in 2009 (where he clarified that at the time

---

[9] Defendant's reading of subsection (b)(3) is further strained to require that "examination for adjustment" mean the adjustment interview, because USCIS did not interview Plaintiff in connection with her application for adjustment. *See* Dkt. 26 ¶ 10, at 7. In the absence of an interview and since it appears that not every applicant receives an interview, it does not follow that examination for adjustment must be a distinct or discrete step from adjudication. For this reason, USCIS's argument is additionally unpersuasive.

10

he filed his application, he was separated) and was nonetheless granted legal permanent resident ("LPR") status in 2009. 379 F. Supp. 3d at 767. The same is true for the plaintiff in *Soumah*, who submitted his official divorce decree to USCIS on September 9, 2009, and was granted LPR status on September 29, 2009. 738 F. Supp. 3d at 635. If the statute was clear that applicants are ineligible for adjustment if they divorce before adjudication or the "examination for adjustment," surely USCIS would not have granted them LPR status, with clear knowledge of their divorce, in *Soumah* and *Dorbor*.

Plaintiff notes that *Dorbor* addressed the same problem differently by concluding that since subsection (b)(5) contains the extending clause, "at the time of examination for adjustment" and subsection (b)(3) does not, Congress specified which requirements it wanted to have met after filing the application. *See* Dkt. 27 at 5-6. If the presumption is that each provision must apply at filing and at adjudication, as Defendant alternately contends, then there would be no reason to specify that an applicant be admissible at examination, especially if an examination or interview does not always occur. Defendant cannot have it both ways.

Rather, it is precisely because subsection (b)(5) contains the limiting phrase, "at the time of examination for adjustment," the admissibility requirement can only be met at the time of examination for adjustment. The limiting provision would have no effect if an examination does not occur. Therefore, "examination for adjustment" must mean adjudication. If examination for adjustment means adjudication, then Defendant's argument that the conditions in each subsection must be true at filing *and* at adjudication falls apart because the phrase "examination for adjustment" would be superfluous. *See Lara-Aguilar v. Sessions*, 889 F.3d 134, 143 (4th Cir. 2017) (stating that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (alteration in original)

11

(quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004))). In addition, as Plaintiff points out, the conclusions in *Soumah* and *Dorbor* that "continues" refers to the "time between the grant of asylum and the filing of the application, not the time between filing the application and receiving a decision" further supports this Court's analysis. Dkt. 27 at 6 (quoting *Dorbor*, 379 F. Supp. 3d at 769).

Defendant next challenges *Dorbor's* reasoning as erroneous because the *Dorbor* court reads into subsection (b)(3) the temporal requirement of subsection (b)(2). Dkt. 24 at 22-23. Defendant is correct that subsection (b)(3) does not contain the phrase "for at least one year after being granted asylum." The *Dorbor* court only arrived at this conclusion after determining that Congress intended for the word "continues" to apply to the "time between the grant of asylum and the filing of the application." 379 F. Supp. 3d at 769.

As stated, this Court finds *Dorbor's* reasoning persuasive. The *Dorbor* court first looked at the legislative history and original enactment of the statute. *Id.* Looking to subsections (b)(1) and (b)(5), the court first reasoned that subsection (b)(1)'s use of the word "applies" for adjustment only becomes operative after an applicant has been in the United States for one year. *Id.* at 769-70. Second, the court concluded that subsection (b)(5)'s admissibility requirement should extend past the point of filing because the reasons why an applicant would become inadmissible are far more grave than if an applicant gets divorced. *Id.*; *accord Soumah II*, 2025 WL 638472, at *5 (acknowledging that the "grounds for inadmissibility . . . carry . . . potential national security or public safety implications" where general eligibility criteria do not).

Defendant's argument regarding Congress's passage of the Child Status Protection Act is also unavailing. *See* Dkt. 24 at 37. Congress realized that children were aging out of the age requirement before USCIS could adjudicate their applications. Thus, Congress provided that a

12

child's age would be locked in at the time they submit their application. *See* 8 U.S.C. § 1158(b)(3)(A)-(B). Defendant uses the Child Status Protection Act as evidence that this issue should be resolved by Congress. Dkt. 24 at 37. If anything, this analogy reflects Congress's intent not to allow something like agency resources and delayed application processing to prevent otherwise eligible family members from being granted asylum.[10]

Defendant's litany of other arguments to support its reading of the statute also fail.[11] Like the arguments raised in *Soumah I* and *II*, Defendant contends that *Cela v. Garland*, 75 F.4th 355 (4th Cir. 2023), restricts this Court's decision. *See* Dkt. 31 at 6 (quoting 75 F.4th at 365). Defendant asserts that, under *Cela*, because the statute at issue requires *de jure* asylum status at the time of adjustment, then applicants must also have *de facto* asylum status at the time of adjustment. *See* Dkt. 31 at 5-8. *Cela*, however, did not answer the question presented to this Court: whether an applicant's "marital status needed to continue past the date of application in order . . . to be eligible for adjustment of status." *Soumah I*, 738 F. Supp. 3d at 643-44. Rather, *Cela* answered the narrower question of whether an applicant must have *de jure* asylum status at the time of filing the application. The *Cela* court concluded, "since Cela had no asylum status *at the time he applied to become a lawful permanent resident*, he had nothing from which he could

---

[10] Conversely, the *Dorbor* court cites the same statute noting that Congress passed the statute to reinforce the idea that age should be determined at the date of application. 379 F. Supp. 3d at 770-71. While the *Dorbor* court acknowledged that "Section 1158(b)(3)(B) is distinguishable from § 1159(b)(3)," it was still persuaded that Congress' intent and other court's interpretations of similar language in other statutes, counseled towards a less restrictive approach. *Id.*

[11] Defendant points to 8 U.S.C. § 1154(b)'s requirement that USCIS assess a petitioner's eligibility based on "the facts stated in the petition" as further evidence that USCIS is not so confined under § 1159(b)(3). Dkt. 24 at 39. To Defendant's point, Congress is certainly clearer in some statutes than in others. Regardless, this Court must determine the best reading of any statutory ambiguity. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024) ("[M]any or perhaps most statutory ambiguities may be unintentional . . . Courts . . . understand that such [ambiguous] statutes . . . have a single, best meaning.").

13

adjust." 75 F.4th at 365 (emphasis added). In contrast, the issue before this Court concerns an applicant who, if at all, became ineligible to adjust her status *after* applying for adjustment, so *Cela* does not bear on this Court's reasoning. *See Soumah I*, 738 F. Supp. 3d at 642-43 (finding that *Cela* did not determine the court's interpretation of § 1159(b)(3) because the plaintiff's asylum status was terminated at the time he applied to become a lawful permanent resident); *accord Soumah II*, 2025 WL 638472, at *6 (concluding that *Cela* "supports the conclusion that a derivative asylee's status is assessed at the time of application").

Lastly, Defendant argues that we cannot fault the agency for delay where Plaintiff also delayed filing her application. Dkt. 24 at 35-36. This Court disagrees. As stated above, Plaintiff should not be penalized for failing to file at the earliest possible time. *See Dorbor*, 379 F. Supp. 3d at 770 ("As this case shows, it can take much longer than one year to render a decision."). Defendant's suggestion that Plaintiff could have initiated a legal action compelling USCIS to act is also disingenuous given that USCIS often argues that similar actions contribute to the delay for other applicants. Moreover, the idea that "any number of choices made by an applicant can affect the adjudication pace" is immaterial to the issue before the Court precisely because Plaintiff is not asking that USCIS adjudicate her application sooner. Dkt. 24 at 36.

While both parties argue that the other's reading of subsection (b)(3) leads to absurd results, only Plaintiff's argument on this point is persuasive. Defendant's argument hangs on a mischaracterization of Plaintiff's argument. Defendant asserts that Plaintiff's reading is absurd because such a reading would require that USCIS never consider changed circumstances when adjudicating an application, like whether the applicant has resettled in a foreign country or withdrawn their application. *See* Dkt. 31 at 17-18. Plaintiff, however, specifically argues only that subsection (b)(3) requires the applicant to continue to be the spouse of a refugee "until they

apply for adjustment of status at least one year after being granted asylum [because it] both avoids erratic outcomes and gives meaning to every word in the statute." *See* Dkt. 19 at 7.

In addition, Defendant asserts that Plaintiff's reading may "incentivize applicants to manipulate their eligibility." *See* Dkt. 31 at 18. In this respect, Defendant contends that its reading safeguards "*bona fide* marriages." *Id.* Applicants that apply to adjust their status with fraudulent marriages may still do so even if they had to wait a longer time for the agency to adjudicate their applications. Neither Plaintiff's reading nor Defendant's reading eliminates this result.

Plaintiff and the other courts have reasoned that the purpose of 8 U.S.C. § 1159(b) was to account for changes in an asylee's home country. Penalizing naturalization applicants who get divorced in the time it takes USCIS to adjudicate their adjustment applications is not material to that purpose. *Dorbor*, 379 F. Supp. 3d at 771 ("Applicants have little control over how long the agency takes to adjudicate an application, so they should not be penalized because of changes that occur 'while their application for adjustment of status languishes in the agency's file cabinet.'" (quoting *Choin v. Mukasey,* 537 F.3d 1116, 1121 (9th Cir. 2008))); *accord Soumah II*, 2025 WL 638472, at *8 ("Particularly where USCIS's interpretation disincentivizes prompt adjudications and penalizes applicants for delays entirely within the Government's control . . . it is USCIS's reading that leads to the absurd result."). To find that a spouse need only "continue" to be a spouse of a refugee for at least one year after being granted asylum, honors that an applicant was lawfully an asylee and timely applied to be lawfully permanent resident. This construction renders the denial of their naturalization applications less arbitrary.

This Court is only asked to review USCIS's denial of Ms. Zalmai's naturalization application. USCIS has stated in each of its denial decisions that it did so because Ms. Zalmai was not lawfully admitted to permanent residence because she had divorced her husband prior to the

adjudication of her adjustment application. A.R. 13-14, 31-34, 62. If the only reason Ms. Zalmai's application was denied was because USCIS did not adjudicate her application soon enough, that is an arbitrary and capricious result. This Court agrees with Plaintiff, and the *Soumah* and *Dorbor* courts, that the best reading of this statute is that an applicant need only continue to be the spouse of an asylee until the applicant applies for adjustment of status at least one year after the asylee has been granted asylum.

### III. *Agency Interpretations Are Not Persuasive*

Although the Court need not address the impact of USCIS's regulations on its interpretation of subsection (b)(3), the agency regulations here do not change the Court's conclusion. Under *Chevron*, agency interpretations never bound a court's interpretation of a statute. *Chevron U.S.A. Inc., v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). *Chevron* established a deference regime which required courts to defer to agency interpretations *if* their interpretations were permissible. *Id.* Under *Loper Bright*, it is less clear exactly how much weight courts should afford agency interpretations. 603 U.S. at 402-03 (acknowledging that agency interpretations may still be persuasive under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). In any event, as stated above, it is now incumbent upon courts "to determine the best reading of [a] statute." 603 U.S. at 400. *Loper Bright* notes that agency interpretations may be "especially informative 'to the extent [they] rest[] on factual premises within [the agency's] expertise . . . [because the] Executive Branch [has] 'power to persuade, if lacking power to control.'" *Id.* at 402 (first citing *Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 98 n.8 (1983), then citing *Skidmore*, 323 U.S. at 140). One possible rule discerned from *Loper Bright* is that as courts interpret statutes, they may accord "due respect for the views of the Executive Branch." *Id.* at 403.

Defendant notes that 8 C.F.R. § 103.2(b)(1) requires that an applicant must establish eligibility "for the requested benefit at the time of filing the benefit request and must continue to be eligible

16

through adjudication." Dkt. 24 at 27. And following, Plaintiff had to comply with this regulation to be statutorily eligible for adjustment to lawful permanent resident status under 8 U.S.C. § 1159(b). *Id.* at 27-28. Plaintiff counters that 8 C.F.R. § 103.2(b)(1)'s requirement that eligibility be established through adjudication is not part of the statutory criteria, nor does it determine what the statute requires. Dkt. 27 at 9-10. This Court agrees with Plaintiff that compliance with agency regulations is not part of the statutory criteria for eligibility of adjustment of status. A failure to properly complete an application form as required by the agency is distinct from the question at issue here—whether Plaintiff met the *statutory* criteria for adjustment eligibility.

First, contrary to Defendant's argument, *Injeti v. USCIS*, 737 F.3d 311 (4th Cir. 2013), does not restrict this Court's decision because it interpreted a different statute and is therefore not on point.[12] Second, as Plaintiff argues, even if this Court agreed with Defendant's reading of *Injeti*, that agency regulations impose requirements to qualify for naturalization eligibility under the statute at issue here, 8 C.F.R. § 103.2(b)(1) does not *itself* impose eligibility criteria like 8 C.F.R. § 103.2(a)(2) did in *Injeti*. *See* Dkt. 27 at 10. 8 C.F.R. § 103.2(a)(2) required applicants to sign applications and affirm that all of the information contained therein "is true and correct." *Id.*; *Injeti*, 737 F.3d at 318. Injeti's application was denied because some of the information Injeti provided was false, which violated the agency's regulation, not because she did not meet the

---

[12] Defendant asserts that *Injeti*'s interpretation of the phrase "regulations as he may prescribe" in 8 U.S.C. § 1255 binds this Court's interpretation of that phrase in 8 U.S.C. § 1159(b). Dkt. 24 at 28-29. *Soumah I* approvingly noted that *Dorbor* relied on *Choin v. Mukasey*, 537 F.3d 1116 (9th Cir. 2008), and *Carpio v. Holder*, 592 F.3d 1091 (10th Cir. 2010). 738 F. Supp. 3d at 638. *Choin* rejected the argument that a spouse must remain married to a citizen until adjudication. *Id.* (citing *Choin*, 537 F.3d at 1121). Similarly, *Carpio* rejected the argument that a child must remain a "minor child" through the date of adjudication. *See id.* (citing *Carpio*, 592 F.3d at 1102). Thus, at least two circuits have held that the statute the *Injeti* court interpreted, 8 U.S.C. § 1255, did not require applicants for adjustment to remain spouses or minor children at the time of adjudication. Clearly, as 8 C.F.R. § 103.2(b)(1) did not determine the statutory criteria of 8 U.S.C. § 1255, 8 C.F.R. § 103.2(b)(1) does not determine the statutory criteria for 8 U.S.C. § 1159(b).

17

*statutory* criteria. 737 F.3d at 318. In other words, in *Injeti*, the plaintiff failed to comply with the agency's regulation, not the statute.[13]

USCIS raised these same arguments with respect to 8 C.F.R. § 103.2(b)(1) in *Soumah I* and that court rejected it as well. 738 F. Supp. 3d at 642. In *Soumah I*, the court held that the regulation, "does not provide an answer to the present question," because if the statute is construed to require only that *eligibility* be established on the date of application, "the applicant would still 'continue to be eligible through adjudication.'" *Id.* (quoting 8 C.F.R. § 103.2(b)(1)). Put differently, if this Court resolves the answer to the statutory question in Plaintiff's favor, there would be no conflict with the regulation.

Here, the Court's interpretation of the statutory criteria determines what the agency regulation may require. *See Soumah II*, 2025 WL 638472, at *8 (noting that a "valid statute always prevails over a conflicting regulation" (quoting *Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013))). If the statute only requires that Plaintiff be married at the date of application, she would still have been compliant with 8 C.F.R. § 103.2(b)(1). On the other hand, if the statute required that Plaintiff be married through adjudication, then Plaintiff would not have met the *statutory* criteria, not the regulation's requirements. This distinction aside, agency interpretations do not bind courts. Even before *Loper Bright*, agency interpretations would not even be entitled to deference if they were "arbitrary, capricious, or manifestly contrary to the statute." *Amaya v. Rosen*, 986 F.3d 424, 432 (4th Cir. 2021) (quoting *Chevron*, 467 U.S. at 844). Thus, even if the Court accepted Defendant's reading of the regulation, to the extent 8 C.F.R. § 103.2(b)(1) would

---

[13] Moreover, in *Soumah II*, the Court reasoned that "[the] certification requirement [in *Injeti*] . . . was entirely consistent with . . . 8 U.S.C. § 1255 and thus could provide an additional requirement for adjustment." 2025 WL 638472, at *8. Here, "8 C.F.R. § 103.2(b)(1) is inconsistent with the statutory language of § 1159(b) in that it would impose a requirement that runs counter to the statute." *Id.*

18

create a requirement that is manifestly contrary to the statute, this Court would reject it.[14] *Accord Soumah II*, 2025 WL 638472, at *8 ("Further, even if 8 C.F.R. 103.2(b)(1) is considered, it does not apply here because, as applied to § 1159(b)(3), it runs contrary to the proper interpretation of the statutory language.").

This Court appreciates that USCIS supposes that its reading of the statute is reasonable and permissible, and even avoids some less desirable outcomes. This Court's directive, however, is to determine the best reading of the statute. 603 U.S. at 400. That is what this Court has done. This reading is consistent with the two courts who determined the best reading of §1159(b) even before *Chevron* was overruled. *Dorbor*, 379 F. Supp. 3d 765; *Soumah I*, 738 F. Supp. 3d 631. It appears USCIS advances nearly all of the same arguments now as it did in front of the court in *Soumah I* and *II*. And as the *Soumah* court was unpersuaded, so is this Court. This Court finds that the best reading of the statute is one that does not prevent people from applying for citizenship because they get divorced during the time it takes to have their adjustment for legal permanent residency adjudicated.

The Court observes and is troubled by the time it takes USCIS to adjudicate these applications, but the Court passes no judgment on that fact. Nevertheless, naturalization applicants, especially those here because they previously sought asylum, should not be penalized for that waiting time. Congress would not have created a pathway for asylum for the family members of asylees, nor further created a specific path to citizenship, if it wanted naturalization

---

[14] The Court notes that in *Regis v. Holder*, which was decided after *Injeti*, the Fourth Circuit interpreted the same provisions of 8 U.S.C. § 1255 and did not rely on 8 C.F.R. § 103.2(b)(1) at all. 769 F.3d 878 (4th Cir. 2014). Under *Chevron* and *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005), the Court deferred to a Board of Immigration Appeals ("BIA") decision determining that minor child status is determined at the time of admission. *Id.* at 882-84. Clearly, the Fourth Circuit did not conclude that *Injeti* tied its hands interpreting the same statute before *Chevron* was overruled. Indeed, *Regis* does not even cite *Injeti*.

applicants to be stymied by something as arbitrary as the time it takes an agency to adjudicate one application. As stated, to so find would lead to an absurd result.

Accordingly, the Court holds that all that 8 U.S.C. § 1159(b)(3) requires is that a derivative asylee continue to be married to the refugee spouse at the time of filing their application in order to be eligible for adjustment of status to lawful permanent residence.

## Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Dkt. 18) is **GRANTED** and Defendant's Motion for Summary Judgment (Dkt. 23) is **DENIED**. Defendant is directed to approve Plaintiff Mursal Zalmai's application for naturalization.

A separate order will issue.

_____
Patricia Tolliver Giles
United States District Judge

Entered on March 27, 2025
Alexandria, Virginia